**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3752-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

EDDIE ROBERSON,

    Defendant-Appellant.

_____

Submitted October 15, 2025 – Decided December 3, 2025

Before Judges DeAlmeida and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 13-10-2585.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Ruth E. Hunter, Designated Counsel, on the brief).

Theodore N. Stephens, II, Essex County Prosecutor, attorney for respondent (Lucille M. Rosano, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Eddie Roberson, serving a prison sentence for the 2013 murder of Talif Crowley, appeals from a 2024 Law Division order denying his application for post-conviction relief (PCR) after an evidentiary hearing. Defendant alleged both his trial and appellate counsel on direct appeal were constitutionally ineffective. He alleges deficient representation spanning from pretrial plea negotiations through direct appeal. He also claims the judgment of conviction (JOC) inaccurately reflects the proper amount of jail credit to which he is entitled. Having reviewed the record in light of applicable legal principles, we affirm, and remand for the limited purpose of amending the JOC to reflect the accurate jail credit.[1]

I.

We derive the facts and procedural history from the records before the PCR court, and our decision on direct appeal. See State v. Roberson, No. A-2446-16 (App. Div. Dec. 26, 2018) (slip op. at 1).

---

[1] Because the parties agree defendant is entitled to an additional fourteen days of jail credit as the prior JOC omitted credit from January 21, 2016 to February 4, 2016, and the sentencing record accurately reflects defendant's entitlement to a total of 1,059 days, on remand the JOC erroneously reflecting 1,045 days should be amended accordingly. See State v. Walker, 322 N.J. Super. 535, 556 (App. Div. 1999) (citing State v. Pohlabel, 40 N.J. Super. 416, 423 (App. Div. 1956)).

A. Pretrial Memorandum and Hearing

In October 2013, an Essex County grand jury charged defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a), arising from the fatal shooting of Crowley earlier that year. It is undisputed the State made no formal or written plea offer to defendant to potentially resolve the case before trial.

On November 10, 2015, the trial court held a pretrial conference, and the prosecutor placed on the record "[t]here ha[d] been . . . nothing close to any meeting of the minds on a potential plea bargain." The prosecutor advised it remained "unclear what [defendant] would take, if anything," and conversations with trial counsel had "been way too far apart." Defendant's counsel confirmed, "I agree. We haven't had any discussions . . . that my client . . . has considered." In the section of the written pretrial memorandum entitled "PLEA OFFER," which directed, "Set forth in detail the plea agreement offered including sentencing recommendations," the handwritten response was "NONE."

Although errors in the written pretrial memorandum, dated December 22, 2014, were not addressed at the hearing, the parties agree the document incorrectly noted defendant was not extended term eligible, when in fact his

prior record subjected him to a discretionary extended term pursuant to N.J.S.A. 2C:44-3(a). The document correctly listed the "maximum sentence if convicted" as "life" imprisonment, but mistakenly listed defendant's "maximum parole ineligibility period" as "thirty-five years."[2] The court, counsel, and defendant signed the document. Defendant was tried by a jury in December 2015.

B. The Trial, Sentencing, and Direct Appeal

As we briefly summarized in our decision on direct appeal:

> The State produced evidence at the jury trial that defendant shot an individual (the victim), who died shortly thereafter. The State's theory was that defendant shot the victim because defendant did not want to honor a Super Bowl bet that he and the victim made at a party shortly before the murder. The State produced a witness who identified defendant as the victim's shooter and claimed to have overheard a conversation about a football bet between defendant and the victim at the party.
>
> [Roberson, slip op. at 1.]

Specifically relevant to defendant's PCR claims, the evidence at trial included testimony from four witnesses present in the vicinity of the Newark shooting on

---

[2] Pursuant to N.J.S.A. 2C:43-7(a)(6), an extended term for murder raises the mandatory minimum term of parole ineligibility from thirty years to thirty-five years. It does not increase the maximum ordinary term for murder beyond life imprisonment.

February 5, 2013.  The State also presented evidence indicating a "Shot Spotter" system detected gunfire at 7:30:22 p.m. within a radius of fifty feet from where the victim was located.[3]

Elizabeth Hodge identified defendant as the shooter and testified as follows.  Prior to the shooting, she knew defendant for "maybe four, five years," and the two lived "in the same area" and would "run into one another frequently."  She also knew the victim for "maybe five to six years."  She indicated she was staying at the Newark residence of a friend who was hosting a Super Bowl party on February 3, 2013.  She testified defendant and the victim attended this party, and she overheard them discuss "betting on the game" in the amount of $700 at some point that day.  Hodge claimed she "was in the kitchen" but did not actually attend the party, and she never pinpointed the time of the bet conversation.

Hodge had not previously revealed that information in her statements to investigators regarding the shooting and what she observed.  She explained law enforcement had questioned her about the shooting only and never inquired

---

[3]  "Shot Spotter" is a system used to detect and triangulate the location of gunshots.  Shot Spotter sensors record any sounds similar to gunshots and transmit the information to a Surveillance Unit that confirms the information and sends the location to the Computer Aided Dispatch (CAD) system.

about the Super Bowl party or any betting days prior so she did not realize its significance.

Two days after the Super Bowl party, Hodge observed defendant and the victim in a disagreement outside her friend's residence, and, when "they were getting ready to shake hands, . . . the next thing [she] kn[e]w [defendant] started shooting." She conceded she could not see clearly enough to describe the gun, but she emphasized she "know[s] what gunfire looks like." After the shooting, Hodge observed defendant begin to walk away, look at her, and "smirk." She explained she did not initially tell investigating officers everything because "[she] didn't want to get involved, and [she] didn't want to walk around having to look over [her] shoulder," but changed her mind the next day after "a lot of soul searching . . . and [deciding] it was the right thing to do." She was vigorously cross-examined about her statements to police and her observations.

Rafael Monroe also testified. After a <u>Gross</u>[4] hearing, the State played at trial a previously recorded statement in which Monroe told detectives he saw defendant and the victim at the time of the shooting. He advised he heard defendant tell the victim, "no, f[***] that, they cheated my team, they cheated my team" and heard "at least six" gunshots less than a minute later. He then

---

[4] <u>State v. Gross</u>, 121 N.J. 1 (1990).

related seeing the victim on the ground and defendant walking away from him. Monroe indicated he knew the victim and described defendant as his "childhood friend," noting defendant's favorite football team was the San Franscisco 49ers.[5] Monroe added, "[defendant], like, he ain't no type you want to f[***] with."

Robert Jackson testified he lived in the area near the shooting for "forty-something years." He knew defendant "since [defendant] was [a] kid[]," and the victim "for over twenty years." He initially testified he was in a parked car when he "heard gunshots" and "didn't actually see the shooting." Finding this testimony inconsistent with Jackson's detailed prior statement to detectives admitting he saw defendant shoot the victim multiple times, the trial court admitted as substantive evidence Jackson's prior recorded statement, which was played for the jury. He told police, "[defendant] was the one doing the shooting," and "shot [Crowley] again when he had his back to him," and "like, he went down, made a turn to come around. He shot him again."

---

[5] The 2013 Super Bowl game featured the San Francisco 49ers versus the Baltimore Ravens.

Jackson then testified he witnessed defendant shoot the victim, explaining he lied because "[he] got threats."[6] Trial counsel objected, and the trial court instructed: "The jury will disregard the last question and answer and will not consider that question and answer in any way, shape or form." The court advised counsel the State was precluded from using the threat testimony unless trial counsel "somehow refers to the statement[]" on cross-examination.

A local bodega owner also testified and identified defendant in court as a person he did not know by name but recognized because defendant came to his store several times a week. He testified he made a bet with defendant on the outcome of the Super Bowl game prior to February 3, 2013, and defendant chose the 49ers to win. He described encountering defendant on the day of the shooting and "call[ing] out to him about the bet," but defendant was "angry" and responded "he wasn't going to pay . . . [because] it was a bulls[***] game." He identified this exchange in photographs taken from his store's surveillance

---

[6] Prior to this testimony, trial counsel advised the court of his concerns that Jackson would testify he received threats when asked why he signed his name as "John Doe" during his interview with investigating officers. Following questioning outside of the jury's presence, Jackson's testimony was restricted to stating he was "concerned about [his] name being seen on the photograph" in which he identified defendant as the shooter.

A-3752-23

camera footage, which aligned with his testimony. He recounted hearing "like seven" gunshots after defendant walked away.

The State played various clips of surveillance footage from around the bodega placing defendant at the scene of the shooting. The Medical Examiner testified the victim was shot seven times at close range and died from his injuries.

Defendant moved to admit text messages from the victim's phone which defendant claimed showed the victim received threats from someone other than defendant the day before his death. The trial court found this exhibit inadmissible as "hearsay . . . and certainly not admissible under any exception," and nonetheless "clearly not relevant to any material issue." Trial counsel also sought permission to question defendant, should he choose to testify, about whether he received a phone call at the time of the shooting and contemporaneously utilize the State's expert report which noted defendant was on a call at 7:31:40 p.m. Presumably, defendant sought to argue he was on the telephone at the time of the shooting and could not have been responsible. The State objected to admitting the expert report through defendant and would not agree to stipulate regarding the time of this call. The court advised counsel that it would "permit [trial counsel] to ask, on direct examination of [defendant],

whether or not he received a call on this date and time." Trial counsel then indicated defendant would testify the call was "associated with his former employment," to which the court instructed defendant to provide any information to the State regarding that call before testifying in any detail about it. Defendant elected not to testify or call any additional witnesses.

The jury deliberated briefly before sending a note to the court indicating an impasse. The judge instructed the jury to continue deliberating, which it did, returning a unanimous guilty verdict on all charges less than two hours later.

After the State moved for a discretionary extended term, trial counsel, at the February 5, 2016 sentencing hearing, advised the court the possibility of a discretionary extended term was "not identified as an issue [in] the final pretrial memo[randum]." The trial court granted the State's motion for a discretionary extended term, finding defendant qualified as a persistent offender. The court then found aggravating factors three, the risk of another offense, N.J.S.A. 2C:44-1(a)(3), six, the nature and extent of defendant's prior record, N.J.S.A. 2C:44-1(a)(6), and nine, the need to deter defendant and others, N.J.S.A. 2C:44-1(a)(9), substantially outweighed the non-existent mitigating factors. After ordering the appropriate merger, the court sentenced defendant to "the term of life during which time he shall not be eligible for parole for a period of sixty-three years

10

and nine months[7] pursuant to the requirements of" the No Early Release Act, N.J.S.A. 2C:43-7.2, for murder, and a concurrent five-year term for unlawful possession of a firearm.

On direct appeal, we rejected defendant's arguments that the trial court (1) unduly pressured the jury to continue its deliberations after indicating an impasse; (2) improperly denied defendant a hearing to challenge the reliability of the bodega owner's confirmatory identification of him; (3) erroneously excluded the text messages of alleged prior threats found on the victim's phone; and (4) unfairly deprived him of his right to speak at sentencing. Roberson, slip op. at 2. We considered five additional points raised by defendant in his self-represented brief and determined they lacked sufficient merit for any further discussion in a written opinion per Rule 2:11-3(e)(2).[8] Id. at 15.

---

[7] The court noted this number was "based on life of seventy-five years, which is a term of life as provided for in our statutes."

[8] Defendant's initial counseled brief before the PCR court identified defendant's self-represented direct appeal arguments, indicating defendant claimed the court precluded him from cross-examining Jackson about "his being under the influence at the [time] of his statement and in court testimony"; allowed the prosecutor to ask Jackson "such an inflammatory and prejudicial question"; and "exclud[ed] defendant's cell phone records which negated the State[']s case in chief." He also argued the State "elicit[ed] known perjured testimony" from Hodge and cumulative "errors caused an unfair result for the defendant."

C. PCR Proceedings

Defendant filed a timely self-represented petition and certification for PCR on August 1, 2019, and assigned counsel thereafter filed supplemental briefs. Collectively, defendant claimed trial counsel was ineffective by failing to: (1) properly advise defendant of his sentencing exposure during pretrial plea negotiations, which caused defendant to reject a plea offer he otherwise would have accepted had he known; (2) "request a Gross hearing for the State's witness . . . Hodge"; (3) raise an objection to the State's discovery violation by failing to disclose Hodge's testimony about the overheard Super Bowl bet between defendant and Crowley; (4) "investigate a third-party defense" regarding the sender of prior allegedly threatening texts to the victim; (5) request the redaction from Monroe's recorded statement of his opinion that defendant "ain't no type you want to f[***] with"; (6) obtain defendant's cell phone records showing he was on the telephone at 7:31:40 p.m., less than eighty seconds after Shot Spotter reported gunshots, or investigate the identity of the caller; (7) "investigate cell location records that would have undermined the credibility of" Hodge's claim that she overheard defendant make the Super Bowl bet at the Super Bowl party; (8) "object to the State's [Brady[9]] violation" alleging the State

---

[9] Brady v. Maryland, 373 U.S. 83 (1963).

did not produce Hodge's statement regarding the Super Bowl bet pretrial; and (9) "file a motion" objecting to the State's "Brady violation" concerning the State's failure to provide defendant with the Shot Spotter report, that reflected a one-minute time discrepancy with the CAD report, undermining defendant's potential argument he had received a call at the precise time of the shooting and could not have done it. He further asserted cumulative prejudice resulting from trial counsel's alleged failures and contended "appellate counsel was ineffective for failing to argue that the trial court's limiting instruction . . . was insufficient to cure the prejudice" caused by the State's eliciting that Jackson was threatened to recant his statement.

The PCR court held initial arguments, and the State asserted all defendant's claims lacked merit and did not warrant an evidentiary hearing. Specifically, the assistant prosecutor who tried the case and appeared at the pretrial conference argued on behalf of the State that defendant's PCR claims concerning plea negotiations failed, as there could be no prejudice because the State never extended a plea offer.

The State relied on its written brief as to the remaining claims but argued defendant's cell phone location records during the Super Bowl game did not refute Hodge's testimony. The prosecutor explained the records showed

defendant's phone in a location in Elizabeth, at the time of the actual game, but "they also show[ed] that for the several hours leading up to the start of the Super Bowl, he was in the vicinity . . . of where Ms. Hodge . . . witnessed this party." The State also dismissed defendant's argument trial counsel did not "research" the cell phone location records, explaining "the discovery include[d] an expert report detailing those phone records" provided by the State.

The PCR court granted an evidentiary hearing on all claims, during which defendant and trial counsel testified. Trial counsel did not readily remember certain details of the representation, but he recalled the State's theory of the case posited a motive that defendant made "a bet on the 49ers, . . . [and defendant's] team lost, and he had made a bet, and thought they were cheated out of the victory, and as a result shot the victim." He could not specifically recall whether he was "surprise[d]" by Hodge's trial testimony concerning the bet or whether he had been provided with the Shot Spotter report prior to trial. Trial counsel recollected attempting unsuccessfully to introduce the text messages received by the victim prior to his death to suggest third-party guilt. He also testified he "probably" sought the cell phone location information for defendant and the victim.

Regarding the plea negotiation process, defendant's trial counsel did not recall precisely his conversations with the State regarding a potential plea agreement, but he indicated his "assumption" that he "discussed the possibility of a resolution" with the prosecutor. When asked if the "defense made any specific offers to the State," defendant's trial counsel responded:

> So, here's what I do recall . . . I recall having a conversation . . . with my client. And I think the conversation went something like this: That I thought the State was probably somewhere in the twenties. Um, and [defendant's] response was an interesting response . . . cause . . . he said ["]they talkin' about running back numbers. I'm looking for quarterback numbers.["]
>
> Of course, I knew what he was talking about. Quarterback numbers at that time were probably anywhere between one and fifteen. The NFL has changed. Running back numbers are twenty-two, twenty-four, thirty-two. So, that was the extent of the conversation.
>
> And I indicated that the State was not interested in what he characterized as quarterback numbers, um, low numbers. They wanted something in the twenties. And he wasn't interested in that. He wanted low, low numbers.

When asked if he made any "offer," counsel responded "probably something in the low first-degree range, maybe high second-degree." When asked whether the State made a counteroffer he again said "probably" and indicated "somewhere around twenty-four or twenty-five" "with eighty-five

15

percent." However, trial counsel clarified, "I don't know that they made a specific counteroffer. But the response was such that the numbers that they were considering were twenty-four, twenty-five and up. Twenty-seven maybe, I don't know." He indicated he "absolutely" conveyed all discussions to his client.

Trial counsel was then specifically asked, "Was it your . . . understanding that you had received . . . counteroffers from the State?" To which he replied, "My recollection is that the State's policy is to not provide, plea offers in homicides." This prompted the following exchange:

> [PCR COUNSEL]: My question was about counteroffers. . . . Did you testify that you had made an offer to the State earlier?
>
> [TRIAL COUNSEL]: What I said [wa]s there were discussions between myself and [the prosecutor]. Um, I discussed with him my recollection, potential resolutions in the low first-degree, maybe second-degree -- high second-degree range. My recollection is the response was if we're talking about a potential resolution, it would have to be in the twenties: twenty-five, twenty-six, twenty-seven.
>
> [PCR COUNSEL]: And you conveyed those discussions to your client[?]
>
> [TRIAL COUNSEL]: Absolutely.

On cross-examination regarding all plea-related discussions with the State, trial counsel reiterated the State had never presented a plea offer:

[PROSECUTOR]: . . . You explained earlier, the . . . Essex County Prosecutor's Office [(ECPO)] never extended a formal offer to [defendant]. Is that correct?

[TRIAL COUNSEL]: Correct.

[PROSECUTOR]: And in the conversations you testified to earlier that between yourself and [the prosecutor] regarding potential resolutions, you related those possibilities back to [defendant] and he rejected them. Is that correct?

[TRIAL COUNSEL]: Correct.

[PROSECUTOR]: And that -- those conversations, they occurred before or after he was made aware that he would conceivably face life in prison if he were to lose at trial?

[TRIAL COUNSEL]: Probably both.

Regarding the pretrial memorandum, trial counsel acknowledged the form accurately reflected defendant's maximum sentencing exposure was life imprisonment, but incorrectly indicated defendant was not extended term eligible. He further acknowledged that "thirty-five" appeared in error as the "maximum parole ineligibility."

However, trial counsel testified he advised defendant regarding his case and the potential consequences should he proceed to trial and be convicted, stating:

> So, in discussing the case, um, . . . my recollection is I discussed with him the strengths and the weaknesses; if

the case could be resolved, um, [it] should be resolved; if it can't, it can't.

Um, the difficulty sometimes . . . as the defense lawyer, from my vantage point, is making sure that clients understand your willingness to challenge the State's case, but at the same time being realistic.

Um, in this instance, I advised [defendant] of the possibility that he could be sentenced to life in prison if he were found guilty. In the face of a potential resolution for a sentence that would have been ten, twelve years that was never offered, that's what we discussed, the possibility. But he wasn't interested in the numbers that [the prosecutor] and I discussed.

When asked if he informed defendant he faced a period of parole ineligibility that could exceed sixty-three years, trial counsel responded, "that was . . . part of the discussion about the life sentence. . . . Face life – you face life in prison, meaning you won't get out."

He indicated defendant never expressed any confusion or misunderstanding of his exposure. He explained his approach to advising his clients, indicating he "speak[s] in terms of time . . . in terms that they would understand." Accordingly, he assured his advice to defendant

was if you're convicted the judge could sentence you to life in prison, which means you could spend the rest of your life in prison versus . . . if we could get the State to agree to something that you're willing to consider, then by all means, resolve it.

18

> But if you're not willing to consider twenty-two, twenty-three, twenty-six, twenty-seven years, and you are adamant about that, just know that the down side could be –is going to be higher than that, much higher [including life].

> [(Emphasis added).]

Regarding his overall representation of defendant, defendant's trial counsel answered "yes" when asked whether "at every opportunity" he "ma[de] motions and put forth the best arguments that were available to [him] at that time." He added that he "practice[d] as a criminal defense attorney" for "over thirty years," and agreed defendant at no point "ever express[ed] any dissatisfaction . . . with [his] representation."

Defendant stated he learned for the first time he was extended term eligible at sentencing. He claimed, had he known, his instructions to his attorney concerning plea negotiations would have been different. Defendant testified he understood his sentencing exposure ranged from thirty years to life imprisonment and believed he was not extended term eligible. He claimed the State offered him a plea agreement under which it would recommend a prison sentence of twenty-five years, which he rejected based on his flawed understanding of what he actually faced if convicted of murder. He also testified he directed trial counsel to continue negotiations, but he was never advised of

any "new offers."  Defendant testified "[he] didn't say anything about no running back and quarterback numbers" rather he "gave him specific numbers."

Defendant testified he had previously pled guilty to other offenses, for which he was sentenced to state prison.  He further indicated he was "aware that people who go to trial for murder may get sentenced to life in prison."

Regarding his remaining claims, defendant testified that on the day of the 2013 Super Bowl, he watched the game in Elizabeth with Monroe, and Hodge was never present while he watched the game.  Defendant stipulated the cell phone records from February 3, 2013, reflected that defendant's cell phone "utiliz[ed] a tower servicing an area including [the location of the Super Bowl party] between approximately 3:00 p.m. and 6:00 p.m." and "between the approximate times of 6:39 p.m. to 11:00 p.m." connected to "towers serving an area including [a sports bar] in Elizabeth."  He further indicated trial counsel had not subpoenaed cell phone location records for his or the victim's phone.

PCR counsel reiterated the arguments presented in the prior written submissions and emphasized the testimony revealed neither trial counsel nor the court corrected the pretrial memorandum errors.  In a written summation, PCR counsel argued the record demonstrated defendant would have accepted what he claimed was the State's counteroffer had he known he faced an extended term or

over sixty-years' parole ineligibility. Additionally, PCR counsel argued "a simple investigation by trial counsel of [defendant's] and decedent's cell phone records, records he already had in discovery," to compare defendant and decedent's locations during the Super Bowl, "would have undermined Hodge's credibility." PCR counsel also contended that, once Jackson testified "he had been threatened to recant," trial counsel should have "reassess[ed] his trial strategy" and should have "cross-examined Jackson about the rest of his statement where he said that he had been intoxicated on heroin at the time of [the] February 5, 2013 incident." PCR counsel claimed the cumulative effect of all of counsel's errors mandated relief.

D. The PCR Court's Decision

On June 28, 2024, the PCR court denied, in its entirety, defendant's PCR petition and issued a written opinion.

The PCR court addressed extensively defendant's claim regarding plea negotiations, noting there was no dispute the pretrial memorandum indicated defendant faced life in prison if convicted of murder, but did not correctly reflect defendant's extended term eligibility, or the "maximum" potential parole ineligibility term. Further, the PCR court found that the State "conceded [it] . . . was unable to . . . confirm [the memorandum] was ever corrected."

21

The PCR court noted "[defendant] was able to question trial counsel as to each of his claims regarding [his] representation" during the evidentiary hearing. The court indicated it observed trial counsel's "appearance and demeanor" and found he "testified in a direct and credible manner," "was calm, professional, and answered all questions posed from [defendant's PCR] counsel and the prosecutor in a straightforward" way, and "was not defensive nor evasive."

Specifically regarding plea discussions, the court stated:

> Trial counsel was clear and unequivocal when he relayed his understanding of the [ECPO's] . . . policy not to extend a plea offer in homicide matters, and was clear that he relayed to [defendant] any and all discussions he had with the State, but that he was never authorized by [defendant] to pursue any specific negotiations, and did not pursue any specific negotiations with the State.

The PCR court determined trial counsel "was clear and unequivocal throughout the questioning [in] indicating, in spite of the mistake on the pretrial memorandum, [defendant] was absolutely aware that if he were convicted of murder, he faced life in prison." The PCR court added its finding "trial counsel was equally clear . . . there were no formal negotiations, . . . there were general conversations between himself and the assistant prosecutor but there was never a formal offer made by the defense or a formal counteroffer made by the State."

22

Further, the PCR court noted, "given the totality of the circumstances surrounding this case," and despite defendant's denials, "the general conversation that resulted in [defendant's] advising trial counsel that he would consider 'quarterback numbers but wasn't interested in running back numbers,' . . . ha[d] the absolute 'ring' of truth." The PCR court concluded, "based on the credible testimony of trial counsel, that [defendant] never authorized trial counsel to engage in negotiations with the State to resolve the pending . . . charges prior to trial" and cited to the transcript from the pretrial conference as corroboration.

As for defendant's reliance on the incorrect pretrial memorandum, the PCR court was "unpersuaded that the inaccurate amount of parole ineligibility on the [pre]trial memorandum forced, compelled, or coerced" defendant in any way and found defendant "was not interested in any plea." The court further determined the State made no formal offer. According to the court, "no evidence ha[d] been presented that the State accepted the non-specific general discussions that resulted in [defendant's] possible willingness to consider 'quarterback numbers' not 'running back numbers'" and "there [wa]s absolutely nothing in the record that indicate[d] to the court that [defendant] would have accepted a plea

offer that would have resulted in a recommendation by the State that would have been acceptable to him."

The court emphasized "trial counsel's unrefuted testimony made it abundantly clear that [defendant] was aware that a loss at trial and a conviction on the charge of murder would result in him facing life in prison" meaning "[defendant] was properly advised by trial counsel of his exposure if convicted of murder, 'that he could spend the rest of his life in prison.'"

The PCR court reiterated it was persuaded

> [defendant] never received an offer from the State, never authorized trial counsel to make an offer, and never engaged in any true plea negotiations. As such, [defendant] cannot now claim successfully that even if he was not advised specifically on the record . . . that he would have changed his clear and unequivocal posture taken with trial counsel before the commencement of trial.

The court further noted, "Simply said, the evidence is clear . . . [defendant] had no interest in resolving the matter by plea agreement" and "there is no evidence the State made an offer or counteroffer, that [defendant] rejected any actual offer, or that [defendant] detrimentally relied upon the misinformation and likely would have accepted the State's offer, and lastly, that the State's offer was one the trial court would have accepted." The PCR court thus concluded defendant had not met his burden of proof as to any of the elements required to

24

succeed under <u>Lafler v. Cooper</u>, 566 U.S. 156, 164 (2012) (setting forth considerations for claims of ineffective assistance of counsel in plea negotiations).

As for defendant's remaining claims of ineffective assistance of counsel, the PCR court stated it "considered all of the arguments made by [defendant], whether in his capacity as self-represented or through counsel," and determined defendant failed to establish a claim of ineffective assistance. The court specifically noted it rejected defendant's argument trial counsel failed to properly investigate or utilize cell phone records related to his and the victim's whereabouts on the date of the Super Bowl party. It found "the cell phone mapping records provided by [defendant] do not relate or have anything to do with the night of the homicide, February 5, 2013," and it was "persuaded that the very records [defendant] claims trial counsel was ineffective for not investigating further . . . would have placed the defendant in the vicinity of the [party] location described by [Hodge]."

The PCR court also found, even accepting the inconsistencies in Hodge's testimony regarding the Super Bowl party, "what clearly was most significant to the jury was [Hodge's] detailed testimony that she watched [defendant], a man she had known and seen every day for the previous five . . . years, shoot another

man . . . [she] had also known for years . . . multiple times at close range" and turn to look at her "before walking off." The court emphasized defendant's trial counsel "zealously questioned [Hodge] and attacked her credibility, focusing on the fact that she had not mentioned these observations in her earlier statements to the police." The PCR court further noted "the jury clearly found [Hodge] a credible witness." The PCR court concluded "the [phone] records [we]re not clearly exculpatory evidence" and any potential doubt they may have raised in impeaching Hodge "[wa]s mere speculation."

The PCR court noted the strength of the remaining evidence including "[Monroe's] original statement to police . . . [which] identified [defendant, his lifelong friend,] as the 'shooter'" and also detailed that "[Monroe] heard [defendant] say, 'they cheated my team, they cheated my team,'" right before the shooting and then "[Monroe] observed [defendant] shoot the victim several times." It further cited to

> video evidence from the area which corroborated [defendant's] presence in the area along with a fourth witness the owner of a neighborhood bodega frequented by [defendant] who placed [him] in the area at the time of the shooting and who testified that [defendant] left the bodega angry, headed towards the location of the shooting, angry about the Super Bowl result, and refusing to pay bets he had made on the game.

26

The PCR court thus concluded that "all of this evidence was clearly capable of supporting the jury's verdict of knowing and purposeful murder," undermining claims of prejudice resulting from any arguable missteps by counsel.

Considering defendant's claims concerning Jackson's "threat" testimony, the PCR court "f[ound] no support for [defendant's] claims that once the 'threat bell' was rung the court's instructions to disregard were insufficient." It further found reasonable trial counsel's election not to probe more deeply Jackson's intoxication on cross-examination as such inquiry risked opening the door to proper testimony regarding the threat. As for trial counsel's alleged failure to seek to redact Monroe's comment that defendant "ain't no type you want to f[***] with," the PCR court found the issue barred as untimely raised under Rule 3:22-4(a). The PCR court ultimately concluded defendant failed to meet his burden as to any of his claims, as "there was more than ample evidence presented to the jury of [defendant's] guilt beyond a reasonable doubt [and defendant's claims] . . . do not carry the heavy burden."

II.

Defendant presents the following arguments on appeal:

POINT I

THE OBJECTIVE EVIDENCE IN THE RECORD DEMONSTRATED INEFFECTIVE ASSISTANCE

27

OF TRIAL COUNSEL WHEN DEFENDANT WAS MISINFORMED THAT HE WAS NOT ELIGIBLE FOR AN EXTENDED TERM AND THAT THE MAXIMUM PERIOD OF PAROLE INELIGIBILITY HE COULD RECEIVE IF CONVICTED AT TRIAL WAS THIRTY-FIVE YEARS. DEFENDANT REJECTED THE STATE'S PLEA OFFER IN THE MID-TWENTIES WITH 85% BASED ON THIS MISINFORMATION AND WAS SENTENCED TO A DISCRETIONARY EXTENDED TERM OF LIFE WITH 85%.

    A.    [Defendant] Was Misinformed and He Rejected the State's Plea Offers Based on This Misinformation

    B.  The PCR Court Used the Wrong Standard

    C.  Remedy

POINT II

THERE MUST BE A REMAND FOR THE PCR COURT TO CONSIDER PETITIONER'S UNADDRESSED ARGUMENTS. SEE STATE v. WEBSTER, 187 N.J. 254, 258 (2006).

POINT III

DEFENDANT IS ENTITLED TO 14 DAYS OF JAIL CREDIT FROM JANUARY 22, 2016 TO FEBRUARY 4, 2016.

III.

A.

"In reviewing a PCR court's factual findings based on live testimony, an appellate court applies a deferential standard; it 'will uphold the PCR court's

28

findings that are supported by sufficient credible evidence in the record.'" State v. Pierre, 223 N.J. 560, 576 (2015) (quoting State v. Nash, 212 N.J. 518, 540 (2013)). Likewise, we accord deference to the PCR judge's firsthand assessment of witness credibility. Ibid. (citing Nash, 212 N.J. at 540). This court is "not bound by and give[s] no deference to the legal conclusions of the PCR court." State v. Harris, 181 N.J. 391, 415 (2004).

The Sixth Amendment of the United States Constitution guarantees a person accused of crimes the effective assistance of legal counsel including the right to adequate legal advice. Strickland v. Washington, 466 U.S. 668, 687 (1984); see also State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the standards established in Strickland). To prove a deprivation of that right, a convicted defendant must satisfy the two-part test of Strickland by demonstrating: (1) counsel's performance was deficient, and (2) the deficient performance actually prejudiced the accused's defense. Strickland, 466 U.S. at 687. "With respect to both prongs of the Strickland test, a defendant asserting ineffective assistance of counsel on PCR bears the burden of proving his or her right to relief by a preponderance of the evidence." State v. Gaitan, 209 N.J. 339, 350 (2012).

A failure to satisfy either prong requires the denial of a PCR petition. Strickland, 466 U.S. at 687, 700. "Although a demonstration of prejudice

29

constitutes the second part of the Strickland analysis, courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, . . . and if not, to dismiss the claim without determining whether counsel's performance was constitutionally deficient." Gaitan, 209 N.J. at 350; see also State v. Alvarez, 473 N.J. Super. 448, 455-56 (App. Div. 2022).

To meet the first prong, a defendant must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland, 466 U.S. at 687. When reviewing such claims, courts apply a "strong presumption" that defense counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 689-90; see also Nash, 212 N.J. at 542.

The second prong requires a defendant to show "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. Because prejudice is not presumed, a defendant must show by a "reasonable probability" that the deficient performance affected the outcome. Fritz, 105 N.J. at 52, 58. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Pierre, 223 N.J. at 583 (quoting Fritz, 105 N.J. at 52). "A conviction is more readily attributable to deficiencies in defense counsel's performance when the State has a relatively

weak case than when the State has presented overwhelming evidence of guilt." State v. Gideon, 244 N.J. 538, 557 (2021). Ultimately, "an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691. Errors with "some conceivable effect on the outcome" fall short of warranting relief. Id. at 693.

B.

The United States Supreme Court has extended these constitutional safeguards to the representation provided by a criminal defense attorney to an accused in plea negotiations. Lafler, 566 U.S. at 162-63; see also Missouri v. Frye, 566 U.S. 134, 144 (2012). Generally, plea counsel "has the duty to communicate formal offers from the prosecution." Frye, 566 U.S. at 145 (concluding an offer with "a fixed expiration date" is "a formal one"); see also State v. Powell, 294 N.J. Super. 557, 564 (App. Div. 1996).

Specific to the plea process, satisfaction of the first Strickland prong requires a defendant to show his trial counsel was deficient by either not advising him of a plea offer or advising him to reject a plea offer based on an erroneous view of the law. See Frye, 566 U.S. at 145; Lafler, 566 U.S. at 163.

31

As for the second <u>Strickland</u> prong,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.
>
> [<u>Lafler</u>, 566 U.S. at 164.]

Essentially, a defendant claiming deficiencies by plea counsel must show there is a "reasonable probability" the result would have been different had defendant received proper advice from the trial attorney. <u>Id.</u> at 163 (citing <u>Strickland</u>, 466 U.S. at 694).

Importantly, it is well-settled "that defendants have 'no right to be offered a plea . . . nor a federal right that the judge accept it.'" <u>Id.</u> at 168 (quoting <u>Frye</u>, 566 U.S. at 148). Further, and more critically, "if no plea offer is made, . . . the issue . . . simply does not arise." <u>Ibid.</u> As the Supreme Court clarified, only "if a plea bargain has been offered," does "a defendant ha[ve] the right to effective assistance of counsel in considering whether to accept it." <u>Ibid.</u>

We have reviewed the record against these guiding principles and perceive no error in the trial court's denying defendant's ineffective assistance claims

32

concerning plea negotiations. The PCR court found defendant's trial counsel credible, and accepted as true his testimony that he accurately advised defendant he faced life imprisonment, and this meant he "could spend the rest of his life in prison." The court further concluded no formal plea offer had been extended. We accept those reasonable findings, which are rooted in the record, and defer to the PCR court's determination, as it viewed the testimony by both defendant and his trial counsel on the subject.

Considering Strickland's first requirement, the PCR court acknowledged the errors in the pretrial memorandum reflecting defendant was not extended term eligible[10] and faced "maximum" parole ineligibility of thirty-five years. However, the court determined, despite those errors, "[defendant] was properly advised by trial counsel of his exposure if convicted." Again deferring to the court's credibility findings, we discern no abuse of discretion in the court's finding, despite the pretrial memorandum errors, counsel adequately and correctly advised defendant of his upper sentencing exposure, the strengths and weaknesses of the State's case, and the nature of any informal discussions

---

[10] We note that although trial counsel conceded he never advised defendant he was subject to a discretionary extended term sentence, the extended term for murder increased the minimum parole ineligibility term from thirty to thirty-five years and did not increase the maximum sentencing exposure.

between trial counsel and the prosecutor regarding a potential resolution of the case by plea agreement.

Nonetheless, we need not decide whether defendant's counsel's failure to correct the errors in the pretrial memorandum or advise defendant of his extended term sentencing eligibility alone rendered counsel's performance deficient within the meaning of Strickland's first inquiry. Even assuming, without finding, trial counsel's actions were constitutionally deficient, we conclude defendant failed to demonstrate the required prejudice resulting from trial counsel's alleged error under Strickland's second requirement.

We are not persuaded the PCR court erred in finding defendant failed to establish that, "but for" trial counsel's purported failure to adequately inform defendant regarding sentencing exposure, defendant would have accepted a plea offer or received a lesser sentence as a result. The PCR court, hearing the testimony, was "unpersuaded that the inaccurate amount of parole ineligibility on the pretrial memorandum forced, compelled, or coerced" defendant to reject an alleged plea offer. Fatal to such claim, as the PCR court correctly determined, the State never extended a formal plea offer to resolve the case. Thus, Lafler's concerns are not implicated. The court reasonably found defendant did not

demonstrate prejudice in claiming he would have accepted a plea offer that never existed.

The record amply supports the PCR court's conclusion that any informal discussions between defendant's trial counsel and the prosecutor never materialized into formal offers or counteroffers. The prosecutor and trial counsel represented at the pretrial hearing that no meaningful discussions had occurred. The pretrial memorandum reflected the answer, "NONE," regarding plea offers extended by the State, "including sentencing recommendations." The State indicated and defendant's trial counsel explained the ECPO's approach to plea offers, and both confirmed no offer was tendered by the State in this case. That counsel may have spoken about hypothetical resolutions does not imbue such exploratory chatter with the formality required to trigger Lafler's safeguards, as "no plea offer [wa]s made." Lafler, 566 U.S. at 168.

We note also defendant failed to show he suffered any prejudice by his unawareness of his discretionary extended term eligibility, as the maximum extended term sentence remained the same, life imprisonment, the top of the ordinary term. Thus, we discern no error requiring relief.

A-3752-23

## C.

We next address and reject defendant's argument the PCR court failed to consider in its decision five of defendant's remaining claims, necessitating remand for further proceedings. He argues the PCR court failed to address his claims that trial counsel failed to: "investigate a third-party defense about the threatening text messages the victim received"; "investigate the identity of the individual who called him at the time of the incident"; "object to the State's discovery violation concerning . . . Hodge's statement that she heard the sports bet"; and object and assert the State's alleged <u>Brady</u> violation for allegedly "failing to provide the Shot Spotter report." He argues the PCR court similarly neglected his claim that appellate counsel failed to effectively "argue that the trial court's limiting instruction was insufficient to cure the prejudice" of Jackson's threat testimony.

Certainly, when "the [PCR court] [does] not comment in any way on [a] defendant's remaining claims, it is not clear . . . [whether the court] considered them." <u>Webster</u>, 187 N.J. at 258. Remand may not be required in every instance, however, and "[t]he appellate court may exercise such original jurisdiction as is necessary to the complete determination of any matter on review." <u>R.</u> 2:10-5. Thus, we may resolve omissions by a PCR court by evaluating those claims,

36

through the exercise of original jurisdiction, "based on objective evidence in the record" to avoid remanding for a new PCR hearing if a remand would result in "considerable expense and further delay." Harris, 181 N.J. at 415-20.

We are satisfied the PCR court thoroughly explored all defendant's claims, written and oral, raised as a self-represented litigant and with the assistance of PCR counsel, as the court assured it had when it concluded defendant failed to meet the Strickland standard as to every claim. The court conducted an evidentiary hearing at which the court placed no restrictions on defendant's presentation and allowed multiple written filings by defendant and twice heard oral arguments. The record readily reflects the court's exhaustive consideration of defendant's claims.

The record also reveals the PCR court expressly addressed and reasonably rejected defendant's claim that further impeachment evidence related to Hodge's bet testimony would have changed the outcome, as the cell phone location records place defendant in the vicinity of the Super Bowl party prior to the game. It similarly addressed the claims regarding Monroe's statement, finding them untimely. It further found trial counsel's strategy reasonable in refraining from further cross-examining Jackson and risking inviting proper testimony about defendant's alleged threats.

The PCR court also expressly found "no support for [defendant's] claims that once the 'threat bell' was rung, the court's instructions to disregard were insufficient."  It reasonably follows that the PCR court did not consider appellate counsel ineffective for failing to challenge the adequacy of the instruction.  Indeed, "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  Smith v. Robbins, 528 U.S. 259, 288 (2000) (citing Jones v. Barnes, 463 U.S. 745, 752-54 (1983)).

Accordingly, we conclude the PCR court "considered all of the arguments made by [defendant]."  However, for completeness, in reviewing the claims defendant contends were overlooked under the de novo standard of review, Harris, 181 N.J. at 419-20, we regard any remaining arguments to be "without sufficient merit to warrant further discussion in a written opinion."  R. 2:11-3(e)(2).  We note only that the evidence presented against defendant at trial was abundant.  Thus, we are unable to identify any prejudice arguably flowing from defendant's claimed errors, alone or in the aggregate, that satisfy Strickland's exacting second requirement.

Affirmed, but remanded solely to correct the JOC.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

38

A-3752-23